State *v.* Ortega

## STATE OF CONNECTICUT *v.* RONY ELIZER ORTEGA
### (SC 20235)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to the tender years hearsay exception (§ 54-86*l* (a) and Conn. Code Evid. § 8-10), "a statement by a child twelve years of age or younger at the time of the statement relating to a sexual offense committed against that child . . . shall be admissible in a criminal . . . proceeding . . . if [inter alia] (1) [t]he court finds, in a hearing conducted outside the presence of the jury . . . that the circumstances of the statement, including its timing and content, provide particularized guarantees of its trustworthiness . . . ."

Convicted of numerous crimes, including sexual assault in the first degree and risk of injury to a child, in connection with the sexual abuse of the victim, N, the defendant appealed. N was three years old at the time of the abuse and is the daughter of the defendant's cousin, J. The abuse occurred when N was alone with the defendant at his house, and N made four disclosures concerning the abuse shortly after it occurred. N made the first disclosure to J's mother, B, after B picked N up from the defendant's house on the day of the incident. B asked if N would like to return to the defendant's house to see his cat again, and N replied that she did not because the defendant had pulled down her pants. The second disclosure occurred shortly after N and B returned home, during which N told J that the defendant had seen her "behind." In response, J asked N if the defendant had also touched her behind, and N pointed to her "front private area." J spoke to B and then went to change N's clothes, when N made the third disclosure. J asked N if the defendant had pulled down her shorts. N initially said "no" but then said "yes." When J asked if the defendant had pulled down her underpants, N initially said nothing but then said that he had. N then demonstrated how the defendant had touched her by inserting her finger inside "where you pee . . . ." N made the fourth disclosure to J the next morning, while J was bathing N. J made an audio recording of their conversation, which was in Spanish. J asked N what had happened at the defendant's house, and N made substantially the same allegations she did the night before. N stated that the defendant had touched her "pola," which J testified is a Spanish term that they used to denote the vaginal area, and again demonstrated the defendant's actions by touching herself. On the first day of trial, the court held a hearing, outside the presence of the jury, on the state's notice of intent to present tender years evidence.

State *v.* Ortega

After hearing testimony from J, the court found that the statements N made to J during N's bath were admissible under the tender years exception because, inter alia, they were made under circumstances that provided particularized guarantees of trustworthiness. The court, however, declined to admit the audio recording of that conversation due to concerns regarding the accuracy of the corresponding transcript, which had been prepared by a translator and interpreter contracted by the state. The transcript included the Spanish transcription of the conversation and a line-by-line English translation, but, in places where the translator was unable to understand what was said, the transcript was marked "inaudible." On the second day of trial, the state proffered a modified transcription of the audio recording, in which J had filled in the sections marked "inaudible" with what she believed had been said. Defense counsel objected, arguing that the defense had no advance notice of the modified transcript and that, because J was not a disinterested witness, the modified transcript was unreliable. Defense counsel also stated that, if the court ruled that the modified transcript was admissible, he would need an opportunity to have Spanish translators review it and to do his own investigation. The trial court, however, admitted the modified transcript. It noted that the defense had had ample opportunity to obtain its own translator to prepare an alternate transcription but stated that counsel would have the ability to ask for additional time to have an interpreter review J's minor modifications to the original transcription. Defense counsel, however, never specified to the court the amount of time he sought and, instead, elected to proceed. On the defendant's appeal from the judgment of conviction, *held*:

1. The trial court correctly determined that the statements N made to J during the bath were made under circumstances that provided particularized guarantees of trustworthiness, and, accordingly, that court did not abuse its discretion in admitting those statements under the tender years exception to the hearsay rule:

   Whether N's statements were made with particularized guarantees of trustworthiness is an issue that was properly analyzed under the totality of the circumstances, and factors that may be considered in determining whether hearsay statements made by a child witness in a child sexual abuse case are reliable include consistent repetition by the declarant, the degree of spontaneity inherent in the making of the statements, the declarant's mental state, use of terminology not within the average ken of a child of similar age, and the existence of a motive to fabricate or lack thereof.

   The challenged statements by N were largely consistent with her prior disclosures, in which she told B that she did not want to return to the defendant's house because he had pulled down her pants and in which, after telling J that the defendant had seen her behind, N pointed to her

State *v.* Ortega

private area in response to J's question regarding whether the defendant had touched her, and the only inconsistencies, namely, N's initial denial that the defendant had pulled down her shorts and her initial silence when J asked if he had pulled down her underpants, did not render the trial court's conclusion that N's statements were trustworthy an abuse of discretion, particularly when the statements at issue viewed in the context of all four of N's disclosures and in light of the fact that N provided consistent answers within moments of her inconsistent statements and demonstrated her willingness and ability to contradict J when N's own version of events did not coincide with an assertion contained in J's questioning.

Although none of N's statements during her bath was purely spontaneous, insofar as each statement followed a question or statement by J, N's statements were consistent with her initial disclosure to B, which was a completely spontaneous response to a neutral question, and N's initial, core allegation during the bath, namely, that the defendant had touched her vaginal area, was spontaneous in nature, as it was completely nonresponsive to J's neutral, preceding question regarding whether N wanted to go see the defendant's cat.

There was no merit to the defendant's claim that the statements N made to J during the bath were unreliable insofar as J asked questions so rapidly that she effectively cross-examined N in order to produce a coerced confession because, in the context of child sexual abuse cases, the use of leading questions with a child does not necessarily render that child's responses untrustworthy.

The evidence regarding N's mental state at the time she made the bath time statements was ambiguous, as the transcript and audio recording of the bath time conversation revealed that N played and made sounds typical of a child her age while she was being bathed, whereas J testified that N looked sad when N first indicated that the defendant had pulled down her pants and touched her, but N's repeated statements that she did not want to return to the defendant's house provided some evidence that N's attitude toward the defendant had changed in a manner consistent with the content of N's statements to J, and, although there was some evidence that N engaged in sexualized behavior during the bath and the night before when J changed N's clothes, no conclusions could be drawn as to what that behavior revealed about N's mental state in the absence of any expert testimony on that point.

The terminology that N used to describe the defendant's behavior was appropriate for her age, as J testified that the she and N used the word "pola" to denote N's vaginal area, and N's physical demonstrations to J, both during the bath and the night before, provided the greatest amount of detail regarding the defendant's actions and were much more specific than her verbal descriptions, consistent with the fact that a child of N's

State *v.* Ortega

age would be expected to lack the vocabulary necessary to describe the charged sexual acts.

The trial court found that N had no motive to fabricate the allegations against the defendant, with whom N had little familiarity and had never been alone, and the record revealed no such motive.

2. This court declined to review the defendant's claim that the trial court had abused its discretion in admitting the modified transcription, prepared by J, of the conversation between N and J during N's bath on the ground that the modified transcription constituted improper lay opinion testimony, that claim having been unpreserved:

Defense counsel did not raise the issue of J's status as a lay witness or object on the basis that the state had failed to proffer J as an expert in the area of creating translated transcriptions, and the objections that defense counsel did raise before the trial court concerning J's bias and the state's failure to provide sufficient notice of its intent to proffer the modified transcript were insufficient to alert either opposing counsel or the trial court of the claim that the defendant raised in this appeal.

3. The defendant could not prevail on his claim that the trial court had abused its discretion in denying defense counsel's request for a continuance, as the record did not support that claim:

In its ruling admitting the modified transcript, the trial court made it clear that, although it would not grant a continuance for the purpose of allowing the defense to produce an alternative transcript, it would consider granting a continuance for the purpose of allowing the defense time to consult with an interpreter regarding J's modifications to the original transcript, but defense counsel, rather than assenting to the court's offer of a continuance and specifying the amount of time he sought, elected to proceed, and, in the absence of any indication as to the length of time defense counsel sought for the continuance, the trial court lacked a proper factual predicate for exercising its discretion to grant the continuance.

Argued April 25—officially released November 8, 2022

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of sexual assault in the first degree, attempt to commit sexual assault in the first degree, and risk of injury to a child, and one count of the crime of sexual assault in the fourth degree, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Pavia, J.*; verdict

State *v.* Ortega

and judgment of guilty of one count each of sexual assault in the first degree, attempt to commit sexual assault in the first degree, and sexual assault in the fourth degree, and two counts of risk of injury to a child, from which the defendant appealed. *Affirmed.*

*Peter G. Billings*, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky*, state's attorney, and *Deborah Mabbett*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. The principal issue in this appeal presents a matter of first impression under the tender years exception to the hearsay rule, namely, delineating the proper bases for the trial court's finding, following a hearing, "that the circumstances of the statement, including its timing and content, provide particularized guarantees of its trustworthiness . . . ." General Statutes § 54-86*l* (a) (1); accord Conn. Code Evid. § 8-10. The defendant, Rony Elizer Ortega, appeals[1] from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), attempt to commit sexual assault in the first degree in violation of § 53a-70 (a) (2) and General Statutes § 53a-49 (a) (1), sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), risk of injury to a child in violation of General Statutes § 53-21 (a) (1), and risk of injury to a child in violation of § 53-21 (a) (2). On appeal, the defendant claims that the trial court abused its discretion by, inter alia, (1) admitting into evidence certain

---

[1] The defendant appealed from the judgment of conviction to the Appellate Court. Because this court has direct jurisdiction over this appeal pursuant to General Statutes § 51-199 (b) (3), this court transferred the appeal to itself pursuant to Practice Book § 65-4.

State *v.* Ortega

out-of-court statements of the victim, N,[2] under the tender years exception to the hearsay rule, (2) admitting a transcript, which had been modified by N's mother, Joselin, of a recorded conversation between N and Joselin, and (3) denying the defendant's request for a continuance during trial. We conclude that the trial court did not abuse its discretion in admitting the out-of-court statements of N under the tender years exception. We further conclude that the defendant failed to preserve his claim that the court abused its discretion in admitting the modified transcript and that the record does not support the defendant's claim that the court denied his request for a continuance. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On the afternoon of June 13, 2015, Joselin and her mother, Belia, were at the mall with Joselin's three year old daughter, N. Rigoberto, N's father and Joselin's husband, watched their one month old baby at home. While Joselin and the others were still at the mall, the defendant, who is Joselin's first cousin and was thirty-three years old at that time, arrived unexpectedly at the home. The defendant asked Rigoberto where N was and said that he would like to take N to see the fire trucks at the fire station, where the defendant's then wife, Jennifer, worked with the junior firefighters program. Rigoberto, who deferred such decisions to Joselin, did not give the defendant permission to take N. Instead, he called Joselin to tell her about the defendant's request. The defendant and Joselin were not close, and N had never been alone with him, so Joselin did not want the defendant taking N on an outing without other adults present.

_____

[2] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State *v.* Ortega

The defendant was still there when Joselin arrived home with her mother and N, sometime between 3:30 and 4 p.m. Because Joselin needed to breastfeed the baby and use the breast pump afterward, she went upstairs after spending only a couple of minutes with the defendant. Rigoberto, who had been waiting until Joselin returned home to finish working on the brakes of his car, went to the garage. Belia was in the kitchen. N was playing outside. The defendant went outside, placed N in his truck, and drove away. The defendant did not tell anyone that he was leaving or that he was taking N with him. Rigoberto, who was under his car working on its brakes, realized that the defendant was leaving only when he saw the defendant's truck drive away. Rigoberto did not know that N was in the truck with the defendant.

While Joselin was still using the breast pump, Belia came upstairs and knocked on the door. Belia told Joselin that the defendant had left and taken N with him. Neither Joselin nor Rigoberto had given the defendant permission to take N with him, and Belia also had not given him permission.[3]

---

[3] The defendant was tried twice for the charges at issue in this case, with his first trial ending in a mistrial and the second trial resulting in the judgment of conviction from which the defendant now appeals. At the defendant's first trial, Belia, who was both N's grandmother and the defendant's aunt, repeatedly stated that she was testifying against her will. She nonetheless testified during the first trial that she did not give the defendant permission to take N. During the second trial, Belia testified, however, that she gave the defendant permission to take N. At the state's request, the trial court concluded that Belia's testimony in the first trial was a prior inconsistent statement admissible for its substance pursuant to this court's decision in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), which is codified at § 8-5 (1) of the Connecticut Code of Evidence. Accordingly, consistent with the judgment of conviction, the jury reasonably could have credited Belia's prior testimony that she did not give the defendant permission to take N with him.

The trial court also ruled that two additional statements from Belia's testimony in the defendant's first trial constituted prior inconsistent statements admissible for their substance pursuant to *Whelan*, namely, that (1) when she picked up N from the defendant's house, she noticed that N's

State *v.* Ortega

The defendant took N to the fire station, where they briefly saw Jennifer, who was assisting in the preparations for a parade that evening in Beacon Falls. When Jennifer saw N with the defendant, she was surprised because she had never before seen the defendant alone with N. She asked N if she wanted to sit inside the fire truck. She placed N in the driver's seat of the truck, and the defendant took a photograph of N. Jennifer then returned to her duties and did not see the defendant and N leave. She previously informed the defendant that she would be attending the parade and would be gone all day. Consistent with her stated plans, Jennifer went to the parade from the fire station and did not stop at home on her way there. She returned home from Beacon Falls sometime between 9 and 9:30 p.m.

When Joselin discovered that the defendant had taken N with him, she was concerned, so she texted him from Rigoberto's cell phone because she did not have the defendant's phone number. In the text message, she asked the defendant if he was only bringing N to the fire station or if he also was bringing her to his house. Sometime after 4:13 p.m., the defendant responded by texting the photograph of N sitting in the firetruck. Joselin called the defendant on her cell phone and asked him where he was; he replied that he had just arrived at his house. Joselin asked when the defendant was bringing N home. He replied "in a little bit . . . ." Joselin told the defendant that she would pick up N. When Joselin finished the call, however, her baby had woken up, so she asked Belia to retrieve N from the defendant's house.

shorts were rolled down, and (2) N had told Belia that she did not want to go back to the defendant's house because he had pulled down her pants. The jury, therefore, reasonably could have credited that testimony.

Consistent with both the trial court's ruling and the judgment of conviction, our summary of the facts incorporates all three *Whelan* statements, as testified to by Belia in the defendant's first trial.

State *v.* Ortega

Sometime around 4:30 p.m., while the defendant and N were alone in the defendant's house, he digitally penetrated N's labia majora and attempted to perform cunnilingus on her.

N made one disclosure to Belia and three disclosures to Joselin regarding what occurred at the defendant's house. The first disclosure was to Belia. When Belia picked up N from the defendant's house, she noticed that N's shorts were rolled down slightly. See footnote 3 of this opinion. While Belia was driving N home, she asked N if she would like to go back to the defendant's house to see his cat again. N said that she did not wish to go back because the defendant had pulled down her pants. See id. Belia arrived at home with N shortly after 5 p.m.

N made her second disclosure, to Joselin, soon after she returned home. Joselin asked N if she went to the fire station. N said that she had and that she had seen fire trucks and a black and white dog. When Joselin asked N if she had seen the defendant's cat, N said "yes," and then added that the defendant had seen "[her] behind." Joselin asked N if the defendant only saw her behind or if he also touched it. In response, N "pointed [to] her front private area." Concerned, Joselin asked Belia if anything had happened when she picked up N from the defendant's house.

Shortly thereafter, N made the third disclosure, to Joselin. After speaking to Belia, Joselin took N upstairs to change her clothes. On the basis of her conversation with Belia, Joselin asked N if the defendant had pulled down her shorts. N said "no," but, when Joselin pulled down N's shorts, N said, "with a very sad expression on her face," "yes, mommy, he did, like that . . . ." Joselin then asked if the defendant had pulled down N's underpants. N said nothing, but, when Joselin pulled down her underpants, N said, "yes, he did." Joselin then

State *v.* Ortega

placed her hand over N's private area and asked if the defendant had touched her "like this . . . ." N said, "no, not like that . . . ." N then inserted her finger inside "where you pee" and touched herself. As she touched herself, N said "chupar," which, Joselin testified, means "suck" in Spanish. Joselin placed N's shorts, underpants, socks and shirt inside the hamper in N's room, without turning them inside out. She then told Rigoberto what N had told her, and they drove to the defendant's house to confront him regarding N's statements.

At the defendant's house, Rigoberto waited in the car while Joselin went to the door. When the defendant came to the door, she asked him if he had taken N to use the bathroom while she was there. The defendant said he had not. When Joselin told him about N's statements, he denied touching N but told Joselin that she "ha[d] to listen to [her] child."

N made the fourth disclosure, which was also to Joselin, the next morning, on June 14, 2015. While giving N a bath, Joselin asked N again what had happened while N was at the defendant's house. Because she wanted Rigoberto to hear what N told her, she used her cell phone to make an audio recording of the conversation, which was in Spanish. During this conversation, N made substantially the same allegations regarding the defendant's conduct, stating that the defendant had touched her in her private area (bath time statements). Specifically, Joselin testified that N told her that the defendant touched her "pola."[4] At one point during the bath time statements conversation, Joselin asked N to show her how the defendant had touched N. N responded by licking her finger, then touching herself inside her

_____

[4] "Pola" is a Spanish term that Joselin and N used to denote the vaginal area.

State *v.* Ortega

labia on the ''little thing where you pee'' with a rotating movement while saying, ''like this, like this, like this.''[5]

The following day, on June 15, 2015, Joselin called a hotline number to report the suspected abuse. That afternoon, investigators from the Department of Children and Families (department) arrived. That same day, the department notified the Danbury Police Department, which immediately began its own investigation of the allegations.

Joselin turned over her cell phone and N's shorts and underpants to the police for use during the investigation. The police sent samples, including cuttings and swabs taken from N's underpants and shorts, to the state forensic science laboratory (lab) to be analyzed. They also sent DNA samples taken from the defendant and N to the lab. One of the samples sent to the lab, a swabbing from the interior front panel of N's underpants, was identified as having two contributors: N and the defendant.[6] As to the defendant's identification as a contributor, testimony at trial established that the expected frequency of individuals who could be a contributor to the sample ''was less than one in seven billion in the African American, Caucasian, and Hispanic male populations.''

On June 30, 2015, Detective Thomas Collins of the Danbury Police Department contacted the defendant and asked if he would be willing to be interviewed at the police station. The defendant agreed and drove to the station that day, where Collins and another detective questioned him.[7] During the course of the interview,

_____

[5] Although Joselin did not use the term ''labia'' during her testimony, she stated that N touched herself on ''the inside of her private area,'' which she described as an area ''inside the lips . . . [where] there's a little thing where you pee . . . .''

[6] A person is included as a contributor to a tested sample when all of his or her ''DNA types'' are detected in the sample.

[7] A redacted recording of the interview was introduced into evidence and published to the jury.

State *v.* Ortega

the defendant made several incriminating statements. One of the detectives asked the defendant if he knew what DNA was and, as an illustration, touched the desk in front of him and said, "if you touch right here . . . I can get your DNA off this . . . ." The defendant indicated that he understood the principle. The detective then asked the defendant if there was any reason why his DNA would be on N's underwear.[8] The defendant first responded, "if I touched her, yes," and then added, "what do mean, like . . . saliva . . . ?" The detectives questioned why the defendant would have thought to ask about saliva but obtained no explanation.

The detectives then asked the defendant if, at any point on the day in question, he had reached inside N's shorts—they informed him that his DNA would not transfer to N's underwear through the outside of N's shorts. As an explanation for the possible presence of his DNA on N's underpants, the defendant claimed that he had been playing with N, holding her by the waist, lifting her up over his shoulders and swinging her. Jennifer, he said, was home and saw him playing with N in this manner. He claimed, in fact, that Jennifer had been home until about five minutes before Belia arrived to pick up N. These latter statements are incriminating because they were contradicted by Jennifer's own testimony at trial.[9]

The defendant was arrested on March 22, 2016, and, on February 20, 2018, he was charged by a substitute long form information in seven counts, with two counts each of sexual assault in the first degree, attempt to

_____

[8] It is undisputed that, at the time the detectives asked the defendant this question, they did not have any evidence that the defendant's DNA had been detected on N's underpants.

[9] At trial, Jennifer, who was at that time no longer married to the defendant, testified that, after she saw the defendant with N at the fire station, she went directly to the parade in Beacon Falls and did not return home until approximately 9:30 p.m. that night.

State *v.* Ortega

commit sexual assault in the first degree, and risk of injury to a child, and one count of sexual assault in the fourth degree. The defendant's first trial ended in a mistrial. See footnote 3 of this opinion.

In the defendant's second trial, which gave rise to this appeal, the state proceeded on the February 20, 2018 substitute long form information. Following trial, the defendant was found not guilty of one count of sexual assault in the first degree and one count of attempt to commit sexual assault in the first degree. The jury found him guilty of the five remaining counts. The trial court rendered judgment of conviction in accordance with the jury's verdict and imposed a total effective sentence of twenty years of imprisonment, execution suspended after twelve years, followed by twenty-five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the trial court abused its discretion in admitting N's bath time statements under the tender years exception, codified at both § 54-86*l* (a) and in § 8-10 of the Connecticut Code of Evidence.[10] Specifically, the defendant contends that the trial court incorrectly concluded that N's bath time statements to Joselin, which Joselin recorded on her cell phone, were made under circumstances that provided "particularized guarantees of . . . trustworthiness," as required by the tender years exception.[11]

_____

[10] The defendant does not challenge in this appeal the trial court's admission into evidence of N's first three disclosures, made to Joselin and Belia on June 13, 2015, namely, her statement to Belia on the way home from the defendant's house, and her statements to Joselin when she first arrived home and while Joselin changed her clothes.

[11] In arguing that N's statements lacked particularized guarantees of trustworthiness, the defendant does not advance independent arguments regarding the statements, as testified to by Joselin, and the statements, as admitted through the audio recording. Indeed, we question whether it would be possible to draw such a distinction. The inquiry into whether the statements

State *v.* Ortega

General Statutes § 54-86*l* (a) (1); accord Conn. Code Evid. § 8-10. The defendant argues that the statements lack such particularized guarantees of trustworthiness because Joselin did not employ proper safeguards during her conversation with N but, instead, elicited responses from N through leading questions and physical prodding.[12] The defendant additionally contends that N's statements lacked the requisite spontaneity; she did not exhibit any sexualized behavior, and she was inconsistent in her account of what had occurred at the defendant's house. In response, the state contends that N's statements were spontaneous and consistent, and that her mental state supported a finding of trustworthiness, because her responses went well beyond Joselin's prompts; N consistently stated that the defendant pulled down her pants and touched her in the vaginal area, and N repeatedly stated that she did not want to return to the defendant's house. Additionally, the state contends that N's young age supports the trial court's finding that she had no motive to fabricate the allegations. We agree with the state and conclude that the trial court did not abuse its discretion in determining that N's bath time statements were made under circumstances that provided particularized guarantees of trustworthiness.[13]

were made under circumstances that provided particularized guarantees of trustworthiness centers on "whether the child declarant was particularly likely to be telling the truth when the statement was made." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 639, 835 A.2d 895 (2003). The answer to that question does not vary depending on whether the statements are introduced through the testimony of a witness or through an audio recording.

[12] We note that the defendant did not seek to proffer an expert to testify regarding the use of leading questions to elicit statements from a child alleging sexual abuse.

[13] The defendant also claims that the trial court abused its discretion in ruling, in the alternative, that N's statements were admissible as a prior inconsistent statement for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Because we conclude that the trial court acted within its discretion in admitting N's statements under the tender years exception to the hearsay rule, we need not reach the separate question

State *v.* Ortega

The tender years exception to the hearsay rule provides in relevant part: "Notwithstanding any other rule of evidence or provision of law, a statement by a child twelve years of age or younger at the time of the statement relating to a sexual offense committed against that child, or an offense involving physical abuse committed against that child by the child's parent or guardian or any other person exercising comparable authority over the child at the time of the offense, shall be admissible in a criminal or juvenile proceeding if: (1) The court finds, in a hearing conducted outside the presence of the jury, if any, *that the circumstances of the statement, including its timing and content, provide particularized guarantees of its trustworthiness*, (2) the statement was not made in preparation for a legal proceeding, (3) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement including the content of the statement, the approximate time, date and location of the statement, the person to whom the statement was made and the circumstances surrounding the statement that indicate its trustworthiness, at such time as to provide the adverse party with a fair opportunity to prepare to meet it, and (4) . . . (A) the child testifies and is subject to cross-examination at the proceeding . . . ."[14] (Emphasis added.) General Statutes § 54-86*l* (a); accord Conn. Code Evid. § 8-10.

The following additional facts and procedural history are relevant to our resolution of the defendant's challenge to the admission of the bath time statements pursuant to the tender years exception. During the first day of evidence, the court held a hearing outside the

whether the court properly admitted those statements on the ground that they satisfied the requirements of *Whelan*.

[14] The language of § 54-86*l* (a) and § 8-10 of the Connecticut Code of Evidence is identical. For ease of discussion, we use the phrase "tender years exception" to refer collectively to both the statutory and evidentiary code provisions.

State *v.* Ortega

presence of the jury on the state's notice of intent to
present tender years evidence.[15] In its proffer, the state
presented the testimony of Joselin, who began by
recounting N's second and third disclosures, both made
to Joselin, when N first arrived home from the defen-
dant's house and then later while Joselin was changing
N's clothes. The prosecutor then questioned Joselin
regarding N's bath time statements. Joselin testified
that she used her cell phone to record the conversation
with N because Rigoberto had not heard N's disclosures
the evening before, and, if N repeated her statements,
Joselin wanted Rigoberto to hear them. Joselin drew
the bath for N and then asked N if she wanted to go
see the cat again, referring to the cat in the defendant's
home. N replied that she did not because the defendant
"sees her private area." When Joselin asked N what
happened, N told her that the defendant had looked at
and touched her "pola . . . ."[16] Joselin asked N how
the defendant had touched her "pola." Joselin testified

_____

[15] At the outset of the hearing, the state indicated that it would argue that
N's bath time statements were also admissible pursuant to *State* v. *Whelan*,
200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597,
93 L. Ed. 2d 598 (1986). Specifically, the state contended that N's statements
to Joselin were inconsistent with N's testimony in court, namely, that N,
who was six years old at the time of trial, could not recollect *any* of the
relevant events, and that she had no idea who the defendant was when he
was pointed out to her in the courtroom. Because her bath time statements
were recorded, and N had authenticated the audio recording by identifying
both her voice and Joselin's, the state argued that N's statements and the
audio recording were admissible pursuant to *Whelan*. As we previously
explained, we do not reach the issue whether the trial court correctly con-
cluded that the statements and the audio recording were admissible pursuant
to *Whelan*. See footnote 13 of this opinion.

[16] We note that the transcript produced by the translator and transcrip-
tionist, Maria Jose Pastor, used the term "cola," translated as "tail," rather
than "pola," which N and Joselin used to refer to N's vaginal area. The
modified transcript produced by Joselin changed the transcript to reflect
that N used the word "pola." Joselin also testified, based on her independent
recollection, that the word that N used during their conversation was "pola."
Accordingly, the jury reasonably could have credited Joselin's testimony
and found that N told Joselin that the defendant touched her "pola," or
vaginal area.

State *v.* Ortega

that, in response, N "brought her finger and—and licked it," and she "touched her private area in a rotation— like [a] rotating motion." When asked to specify in greater detail where N touched herself, Joselin clarified that N touched herself "*inside* her private area." (Emphasis added.) While she touched herself, N pursed her lips as though she were sucking on something.

Through defense counsel's cross-examination of Joselin during the state's proffer, Joselin admitted that she, rather than N, initiated all three of their conversations regarding what had happened at the defendant's house: when N first arrived home from the defendant's house, when Joselin changed N's clothes, and when N made the bath time statements. Defense counsel then asked Joselin if she had ever seen the transcript of the audio recording—in the original Spanish, along with an English, line-by-line translation—that had been prepared by Maria Jose Pastor, a translator and interpreter contracted by the prosecutor's office. Joselin said that she had seen the transcription. Defense counsel then asked Joselin to pinpoint which part of the transcript corresponded to N's physical demonstration of how the defendant had touched her. Joselin said that she could not.

Defense counsel also called Joselin's attention to the portions of the transcript that reflect that N said "ow" and asked Joselin whether she had pinched or poked her daughter during their conversation. Joselin responded that she had not. Defense counsel then read from the transcript and asked Joselin whether she had asked N multiple questions in a row without receiving a response from N.[17] Joselin pointed out that the tran-

[17] Specifically, defense counsel stated that the transcript reflected that Joselin asked N: "What happened, my love?" "[D]oes it hurt?" "Why did you say 'ow,' does your tail hurt?" "Why does it hurt?" And "[d]o you want to go see the cat?" Joselin denied that she had used the Spanish word for "tail" but agreed that she had asked N each of these questions.

State *v.* Ortega

script did not indicate that N had not responded but, rather, that her response was inaudible. Defense counsel asked Joselin whether, prior to the bath time conversation, she had conducted Internet searches regarding how to determine whether a child has been abused. Joselin responded that she had done so. Defense counsel then asked whether Joselin's purpose in recording the conversation was to create a record for reporting the incident. Joselin reiterated that her purpose in recording the conversation was to share it with her husband.

Defense counsel also highlighted inconsistencies in N's statements the night before, when Joselin was changing N's clothes. Specifically, he emphasized that N's initial response when Joselin asked whether the defendant had removed her underpants was "no." Defense counsel asked whether, when Joselin pulled off N's underpants, she asked N a second time if the defendant had removed them. Joselin said she had not. She testified that she asked N only once whether the defendant had removed her underpants. When Joselin pulled down N's underpants, N said, "he did, just like that, mommy."

The state argued that N's statements to Joselin met the requirements of the tender years exception to the hearsay rule and also sought to admit into evidence the audio recording of those statements. Defense counsel objected to the admission of all three of N's disclosures to Joselin, but particularly to the admission of her statements while Joselin changed N's clothing, to the bath time statements and to the audio recording of the bath time statements. Defense counsel contended that N's statements were not reliable. The sheer number of leading questions, he claimed, demonstrated that N's statements, rather than spontaneous, were akin to a "forced confession . . . ."

State *v.* Ortega

As to the audio recording, defense counsel argued that, because the recording was turned over to the authorities the next day, Joselin's motivation to record the conversation was unclear. Defense counsel emphasized both Joselin's inability to identify the portion of the transcript that corresponded with N's demonstration of how the defendant touched her and Joselin's testimony that some portions of the translation were inaccurate. Finally, defense counsel relied on the law of the case doctrine to argue that the ruling of the court in the defendant's first trial, precluding admission of the audio recording, controlled during the second trial.

The trial court found that N's statements were "of a trustworthy nature" for purposes of the tender years exception.[18] In support of that conclusion, the court made the following findings: The statements were made proximate in time to the occurrence of the incident. There was no evidence that N had been coached or forced to make the statements or that N had any reason to fabricate the story. As for the leading nature of some of Joselin's questions, the court acknowledged its importance but determined that that factor went to the weight rather than the admissibility of the statements and was a proper subject for defense counsel to explore on cross-examination. The court initially declined to admit the audio recording because it had some concerns regarding the accuracy of the transcription. The court

---

[18] The trial court also found that, at the time the statements were made, N was under twelve years of age. The court further found that, rather than statements made in preparation for trial, N's statements were the result of a mother's attempt to determine the specifics of the allegations her daughter was making. The court observed that Joselin had not spoken to the police, an attorney, or any other person with the idea of pursuing the arrest or prosecution of the defendant in connection with N's disclosures. The court found that N had testified, had been made available for, and, in fact, had been subject to cross-examination, and that the state had provided the required notice to the defendant of its intent to offer the statements under the tender years exception. The defendant does not challenge any of these findings on appeal.

specifically referenced Joselin's testimony that the transcription incorrectly recorded the word "pola" as "cola." See footnote 16 of this opinion. The court also relied on the fact that various portions of the audio recording were marked "inaudible" in the transcription. The court indicated, however, that it would entertain additional arguments on the issue of the admissibility of the audio recording.

The next day, during a second hearing held outside the presence of the jury, the trial court revisited its ruling declining to admit the audio recording. To address the court's concerns regarding the accuracy of the transcription, the state offered a version of the transcript that had been modified by Joselin to fill in some of the sections marked "inaudible" in the original transcript and to reflect that N had used the word "pola" rather than "cola." As to the audio recording, the state argued that the mere fact that some portions of Pastor's transcription indicated that segments of the audio recording were "inaudible" did not render the recording inaccurate. The state also contended that there was no "better way," than by listening to the actual recording of the statement, for the jurors to evaluate the credibility of N's statement and to consider whether to credit the various challenges raised by the defendant—including the claims that Joselin pinched or poked her in order to induce N's statements and that she had asked a rapid sequence of leading questions that effectively constituted a cross-examination. Defense counsel argued in response that the court should not admit the audio recording because (1) given N's inability to recall the events, counsel could not cross-examine N regarding the bath time statements, (2) under the law of the case doctrine, the court was bound by the ruling of the court in the defendant's first trial, (3) the statements were unreliable, and (4) the modified transcript was unrelia-

State *v.* Ortega

ble and had been disclosed too late in the proceedings, causing unfair prejudice to the defendant.

The court concluded that the audio recording was admissible under the tender years exception to the hearsay rule and, in the alternative, pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). See footnote 13 of this opinion. The court observed that the audio recording constituted the best evidence of N's statements and would assist the jury in evaluating defense counsel's arguments that the statements should not be credited. The audio recording, the court explained, would allow jurors to hear the inflections in the speakers' voices and to evaluate any pauses between Joselin's questions and N's answers. Jurors would be able to listen for themselves and to decide whether to credit the defense's theories that Joselin was pinching and/or poking N to produce the desired response and that she also was asking questions so quickly and repeatedly that she effectively was cross-examining N in order to produce "a coerced confession . . . ."

We emphasize that the sole issue that we are called on to resolve with respect to the admission of N's bath time statements under the tender years exception to the hearsay rule is whether the trial court correctly determined that the statements were made under circumstances that provided "particularized guarantees of . . . trustworthiness . . . ." General Statutes § 54-86*l* (a) (1); accord Conn. Code Evid. § 8-10; see footnote 18 of this opinion. We begin with the standard of review. "Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling

State *v.* Ortega

. . . .'' (Footnote omitted; internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 811, 865 A.2d 1135 (2005).

This appeal presents our first opportunity to consider the nature of the "particularized guarantees of . . . trustworthiness" that will support the admission of a statement under Connecticut's tender years exception.[19] General Statutes § 54-86*l* (a) (1); accord Conn. Code Evid. § 8-10. The following general principles guide our analysis. "An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Citation omitted.) *State* v. *Merriam*, 264 Conn. 617, 633, 835 A.2d 895 (2003). "Beyond these general evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment." Id.

"For purposes of the confrontation clause, [nontestimonial] hearsay statements are admissible if (1) the declarant is unavailable to testify, and (2) the statement bears adequate indicia of reliability. . . . A statement is presumptively reliable if it falls within a firmly rooted hearsay exception. . . . A hearsay exception is firmly rooted if it rest[s] [on] such solid foundations that admission of virtually any evidence within [it] comports with the substance of constitutional protection. . . . Evidence admitted under such an exception thus is

_____

[19] This court previously has considered other aspects of the tender years exception. See *State* v. *Manuel T.*, 337 Conn. 429, 447–48, 254 A.3d 278 (2020) (discussing relationship between hearsay exception for statements made in furtherance of medical diagnosis or treatment and tender years exception); *State* v. *Maguire*, 310 Conn. 535, 572–76, 78 A.3d 828 (2013) (concluding that hearing is mandatory prior to admission of statements pursuant to tender years exception and that, in light of history of tender years exception, evidence admitted under that exception is admissible for substantive purposes, rather than limited to corroboration).

State *v.* Ortega

presumed to be so trustworthy that adversarial testing would add little to its reliability. *Idaho* v. *Wright*, [497 U.S. 805, 821, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990)]. Evidence that does not fall within a firmly rooted hearsay exception, however, is inadmissible under the [c]onfrontation [c]lause absent a showing of particularized guarantees of trustworthiness.''[20] (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Merriam*, supra, 264 Conn. 634–35.

The tender years exception, which is a relatively new provision under Connecticut law, was codified at § 54-86*l* (a) and as a rule of evidence at § 8-10 of the Connecticut Code of Evidence, in 2007 and 2008, respectively. See Public Acts 2007, No. 07-143, § 11; Conn. Code Evid. § 8-10. It is not a firmly rooted exception to the hearsay rule, and evidence is admissible under the tender years exception only if there is a showing of particularized guarantees of trustworthiness. See *State* v. *Merriam*, supra, 264 Conn. 634–35. Beyond the exception's relatively recent adoption in Connecticut, language in the tender years exception itself supports this conclusion. That is, the tender years exception expressly requires that the proffered statement must have been made

[20] In *State* v. *Aaron L.*, supra, 272 Conn. 813 n.21, we recognized the overruling of *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), by *Crawford* v. *Washington*, supra, 541 U.S. 36. That overruling logically extends to *Idaho* v. *Wright*, supra, 497 U.S. 805, the reasoning of which was predicated on the *Roberts* reliability rule. In *Aaron L.*, however, we observed that the holding of *Crawford* was limited to testimonial statements. See *State* v. *Aaron L.*, supra, 813 n.21. Because the statement at issue in *Aaron L.* did ''not fall within any of the classes of testimonial statements discussed by the [United States Supreme] [C]ourt in *Crawford*,'' we concluded that ''application of the *Roberts* test remains appropriate.'' Id. Likewise, in the present case, because the trial court made a factual finding for purposes of the tender years exception, which is unchallenged on appeal, that N's statements were *not* made in preparation of trial; see General Statutes § 54-86*l* (a) (2); Conn. Code Evid. § 8-10; her statements were nontestimonial for purposes of *Crawford*, and application of *Roberts* and *Wright* to the admissibility of N's statements remains appropriate.

State *v.* Ortega

under circumstances that provide "particularized guarantees of its trustworthiness . . . ." General Statutes § 54-86*l* (a) (1); accord Conn. Code Evid. § 8-10. The employment of that phrase, the same one used in *Wright*, indicates that the drafters of the provision viewed the tender years exception as one that is not firmly rooted. Specifically, the minutes of the February 27, 2007 meeting of the Code of Evidence Oversight Committee indicate that the language of the tender years exception was based on a model statute published in the Harvard Journal on Legislation. See Code of Evidence Oversight Committee of the Supreme Court, Meeting Minutes (February 27, 2007) p. 1, available at https://www.jud.ct.gov/committees/code_evidence/code _ev_minutes_022707.pdf (last visited October 31, 2022); see also R. Marks, Note, "Should We Believe the People Who Believe the Children?: The Need for a New Sexual Abuse Tender Years Hearsay Exception Statute," 32 Harv. J. Legis. 207, 253–54 (1995). The model statute published in the article in part reflected the analysis in *Idaho* v. *Wright*, supra, 497 U.S. 805. See R. Marks, supra, 247 and n.210. Consistent with the article's analysis, our sister state courts also have concluded that child hearsay statements admissible under statutory exceptions to the hearsay rule are not firmly rooted exceptions and, therefore, are properly analyzed under *Wright* to determine whether the statements bore particularized guarantees of trustworthiness. See, e.g., *Thomas* v. *State*, 725 A.2d 424, 428 (Del. 1999) (applying *Wright* to determine whether child hearsay statements bore particularized guarantees of trustworthiness); *State* v. *D.G.*, 157 N.J. 112, 125–26, 723 A.2d 588 (1999) (same).

Accordingly, consistent with the analysis in *Idaho* v. *Wright*, supra, 497 U.S. 805, the particularized guarantees of trustworthiness requirement for admissibility under the tender years exception properly is analyzed

State *v.* Ortega

under the totality of the circumstances. To identify the circumstances relevant to the analysis, we find instructive this court's decision in *State* v. *Merriam*, supra, 264 Conn. 617, which applied *Wright* in considering whether the trial court properly admitted, under the residual exception to the hearsay rule, the out-of-court statements of a three year old complainant alleging that the defendant in that case had sexually assaulted her. See id., 634–56. This court applied the totality of the circumstances analysis from *Wright* because the residual exception is not a firmly rooted hearsay exception, thus requiring the court to determine whether the statements at issue in *Merriam* bore particularized guarantees of trustworthiness, such that the admission of the statements comported with the requirements of the confrontation clause. See id., 634–35.

In *Merriam,* we noted that "[t]he court [in *Wright* had] identified a number of factors [that] . . . properly relate to whether hearsay statements made by a child witness in [a] child sexual abuse [case] are reliable." (Internal quotation marks omitted.) Id., 639. We looked to the nonexclusive list of factors identified in *Wright*, which included "(1) the degree of spontaneity inherent in the making of the statements; (2) consistent repetition by the declarant; (3) the declarant's mental state; (4) use of terminology not within the average ken of a child of similar age; and (5) the existence of a motive to fabricate or lack thereof." Id., citing *Idaho* v. *Wright,* supra, 497 U.S. 821–22. We further noted that the court in *Wright* "emphasized that the unifying principle underlying the enumerated factors is that they relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." (Internal quotation marks omitted.) *State* v. *Merriam,* supra, 639. Regarding the multifactored nature of the test, we observed that the court in *Wright* stated "that it was not endorsing any particular mechanical test for

State *v.* Ortega

determining particularized guarantees of trustworthiness under the [confrontation] [c]lause . . . and that courts have considerable leeway in their consideration of appropriate factors.'' (Citation omitted; internal quotation marks omitted.) Id., 639–40. In *Wright*, the United States Supreme Court clarified that, in evaluating the trustworthiness of an out-of-court statement, courts must not consider other evidence that corroborates the substance of the statements.[21] The court explained that ''the use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial . . . .'' *Idaho* v. *Wright*, supra, 823.

In *Merriam*, this court applied these factors and concluded that the statements at issue in that case were made under circumstances providing particularized guarantees of trustworthiness. In that case, a social worker at a day care center testified that she noticed the child complainant moving her hips in a sexualized manner. *State* v. *Merriam*, supra, 264 Conn. 623. When the social worker approached the child and asked her what was wrong, she responded: '' 'Daddy.' '' Id., 624. The complainant's mother testified that, after being informed of the events at the day care center, she asked the complainant what had happened, and the complainant responded that '' '[d]addy hurt her in the private area.' '' Id., 646. This court concluded that both statements, viewed under the totality of the circumstances, bore particularized guarantees of trustworthiness. We

_____

[21] Accordingly, in evaluating the trustworthiness of N's statements, the trial court in the present case properly did not consider the forensic evidence showing the presence of the defendant's DNA on the interior front panel of N's underpants, and we do not consider that or any other corroborating evidence in our review of the trial court's finding that N's statements were trustworthy. The defendant has not claimed that N's prior statements constitute corroborating evidence.

State *v.* Ortega

noted that both statements were consistent with each other and "were made by a very young child with no apparent motive to lie in response to neutral inquiries from different questioners." Id., 648. Moreover, the complainant's behavior was "very unusual for a child her age"; id., 643; indicating that she was "reacting to some highly stressful or disturbing experience." Id., 644.

Turning to the record in the present case, we note that, although the trial court did not expressly rely on *Wright* or *Merriam*, it nevertheless analyzed N's statements under the totality of the circumstances to determine whether the statements bore particular guarantees of trustworthiness. In particular, it considered whether N had a motive to lie and whether she was forced to speak, and it also took into account that the statements were made soon after the incident. Because the court's application of the tender years exception was not, therefore, based on a clear misconception of the law, we review the court's ruling for abuse of discretion. See *State* v. *Aaron L.*, supra, 272 Conn. 811.

Having reviewed the record, we conclude that the trial court did not abuse its discretion in admitting N's bath time statements under the tender years exception to the hearsay rule. We consider the totality of the circumstances, mindful that "the unifying principle" underlying the inquiry "is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Idaho* v. *Wright*, supra, 497 U.S. 822. We conclude that "the circumstances of [N's bath time] statement[s], including [their] timing and content, provide particularized guarantees of [their] trustworthiness." General Statutes § 54-86*l* (a) (1); accord Conn. Code Evid. § 8-10.

N's bath time statements were largely consistent with her prior statements, both to Joselin and to Belia. Specifically, when Belia drove N home from the defendant's

State *v.* Ortega

house, N told her that she did not want to go back
because the defendant had pulled down her pants.
Afterward, Joselin asked N if she had seen the defen-
dant's cat, and N responded "yes" and added that the
defendant had seen "[her] behind." When Joselin asked
N if the defendant had also touched her behind, N
"pointed [to] her front private area."

The only inconsistency, emphasized by the defen-
dant, occurred while Joselin was changing N's clothes.
At first, N said the defendant had not pulled down her
shorts, but, as Joselin took off her shorts, N said the
defendant had done the same. When Joselin asked if
the defendant had pulled down her underpants, N was
silent at first, but, when Joselin pulled down her under-
pants, N said the defendant had also done that. Viewed
in the context of all four of N's disclosures to Belia and
Joselin, these two inconsistencies do not persuade us
that the trial court abused its discretion in deeming
N's bath time statements trustworthy, particularly given
that N provided consistent answers within moments
of the inconsistent statements. We also note that the
remainder of N's statements while Joselin changed N's
clothes were consistent with the other disclosures. That
is, after Joselin had removed N's shorts and underpants,
she placed her hand over N's private area and asked if
the defendant had touched her "like this . . . ." N cor-
rected her, saying, "no, not like that," and then inserted
her finger, as Joselin testified, "where you pee," and
touched herself. The child demonstrated that she was
willing and able to contradict her mother when her own
version of events did not coincide with an assertion
contained in her mother's questioning.

None of N's bath time statements was purely sponta-
neous because each followed a question or statement
by Joselin. As we noted, however, the bath time state-
ments are consistent with N's initial disclosure to Belia,
which was a completely spontaneous, non sequitur

State *v.* Ortega

response to a neutral question. There was, moreover, some degree of spontaneity to N's bath time statements. Most important, N's core allegation, namely, that the defendant touched her vaginal area, was nonresponsive to Joselin's neutral, preceding question. Specifically, Joselin asked N, "[d]o you want to see the cat after you bathe?" N responded, "[n]o, because [the defendant] touches my [pola]."

We consider it particularly significant that N's initial disclosure was completely nonresponsive to Joselin's question and, therefore, was spontaneous in nature. Joselin asked N about the cat, and N responded by volunteering that the defendant had sexually assaulted her. We also note that, in *Wright*, the United States Supreme Court cautioned against concluding that the failure to adhere to procedural requirements, such as avoiding leading questions, necessitates the conclusion that the statements are untrustworthy as a matter of law. The court explained that such procedural requirements "may in many instances be inappropriate or unnecessary to a determination whether a given statement is sufficiently trustworthy for [c]onfrontation [c]lause purposes." *Idaho* v. *Wright*, supra, 497 U.S. 818. In the context of child sexual abuse cases, the court cited with approval the proposition that the "use of leading questions with children, when appropriate, does not necessarily render responses untrustworthy . . . ." Id., 819. Accordingly, although it is relevant that Joselin asked some leading questions during the conversation,[22] the fact that N's initial allegation was nonre-

_____

[22] For example, after N's initial disclosure, Joselin asked N an open-ended question—how had the defendant touched her? When N responded that she did not know, however, Joselin followed up with a leading question: "With his hand?" N responded, "Yes, with his hand." Joselin's next question, however, was open-ended. She said, "I want to see. What did his hand do? Show me what his hand did." Joselin asked other leading questions, such as "[d]id he scold you?" N responded that he did not. Joselin also asked N, "[y]ou weren't scared?" N's answer was inaudible. Thus, our review of the bath time conversation reveals that Joselin asked a mix of some leading and some open-ended questions.

State *v.* Ortega

sponsive to Joselin's question persuades us that N's statement that the defendant touched her "pola" was sufficiently spontaneous to render it trustworthy.

Evidence in the record of N's mental state at the time she made the bath time statements is ambiguous. The night before, when she first told Joselin that the defendant had pulled down her pants and touched her, Joselin testified that N looked "sad . . . ." The transcript of the audio recording of the bath time conversation, and the recording itself, reveal that, while she was being bathed, N played and made sounds typical of a child her age during bath time. Her repeated and consistent statements, however, both to Belia and Joselin, that she did not want to return to the defendant's house provide at least some evidence that N's attitude toward the defendant had changed in a manner that is consistent with the content of the bath time statements.

Although there is some evidence that N engaged in sexualized behavior, both during the bath time conversation and the night before, when Joselin was changing her clothes, we draw no conclusion regarding her mental state on the basis of that evidence. During the bath time conversation, N demonstrated how the defendant had touched her by licking her finger and touching herself inside her labia with a rotating movement. The night before, when Joselin was changing her, to demonstrate how the defendant touched her, N inserted her finger inside "where you pee," touched herself and said "chupar," which means "to suck," and then made sucking noises with her mouth. It is unclear, however, whether N's behavior sheds light on her mental state. In both instances, it was clear that N was communicating to her mother by showing her what the defendant had done. Her behavior certainly raises questions regarding her mental state. In the absence of any expert testimony on this point, however, beyond looking to her behavior as describing an event that was beyond

State *v.* Ortega

the reach of her vocabulary, we cannot draw any conclusions as to what her behavior reveals about her mental state.

The terminology that N used to describe the defendant's behavior was appropriate for her age. Joselin testified that the word "pola" was one that she and N used between themselves to denote N's vaginal area. We also observe that N's physical demonstrations to her mother, both during bath time and the night before, provided the greatest amount of detail regarding what the defendant had done to her. Her demonstrations were much more specific than her verbal descriptions of what had happened, consistent with the fact that a child of her age would be expected to lack the vocabulary to describe acts of digital penetration and cunnilingus.

Finally, the trial court found that N had no motive to fabricate the allegations against the defendant, and the record reveals none. She had little familiarity with the defendant and had never been alone with him before the incident. Accordingly, our review of the totality of the circumstances surrounding N's bath time statements persuades us that the trial court acted within its discretion in concluding that those statements bore particularized guarantees of trustworthiness.[23]

_____

[23] We find unpersuasive the defendant's claims that the bath time statements were unreliable because, according to the defendant, Joselin conducted the equivalent of a cross-examination of N during the bath time conversation, throwing questions at her in rapid fire sequence, and because, according to the defendant, Joselin was poking and prodding N during the conversation in order to induce N to make the statements, as evidenced by the fact that N said "ow" several times during the bath time conversation. Both of these claims are predicated on factual assertions that, if the trial court had credited them, properly could have served as a basis for a determination that the statements lacked particularized guarantees of trustworthiness. Not only is the record devoid of any such factual finding by the trial court in this case, but the court's response to the defendant's reliance on these arguments was that the audio recording would allow the jury to determine whether to credit the defendant's claim that Joselin had poked and prodded N in order to induce her to accuse the defendant of sexual abuse.

State *v.* Ortega

## II

The defendant next claims that the trial court abused its discretion in admitting a modified, translated transcription, prepared by Joselin, of the audio recording of N's bath time statements. The defendant contends that the modified transcription—which filled in some text that had been marked "inaudible" in Pastor's official transcription, substituted the word "pola" for "cola," and then translated those changes into English—constituted improper lay opinion testimony, in violation of § 7-1 of the Connecticut Code of Evidence.[24] A translated transcript, the defendant contends, constitutes expert opinion testimony, and Joselin had not been proffered or qualified as an expert witness pursuant to § 7-2 of the Connecticut Code of Evidence.[25] The state responds, inter alia, that the defendant's claim is unreviewable because the defendant did not claim before the trial

---

The defendant also argues that Joselin's Internet research on how to determine whether a child has been abused demonstrates that Joselin did not follow procedural safeguards. In connection with this contention, the defendant highlights that Joselin was not a disinterested questioner—as N's mother, she was biased and likely had preconceived notions of what N would say. Certainly, Joselin's status as a biased interlocutor, a status that hardly can be questioned, is relevant, but the defendant does not make clear how Joselin's status and her research affected the actual nature of her questions, other than suggesting that some of her questions were leading, that her manner of questioning was akin to a cross-examination, and that she poked N to induce her to accuse the defendant. We have already rejected these claims as a basis for concluding that the trial court abused its discretion in finding that N's statements were trustworthy.

[24] Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue."

[25] Section 7-2 of the Connecticut Code of Evidence provides: " A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

State *v.* Ortega

court that the modified transcript constituted improper lay opinion testimony. We agree with the state that, because the defense did not object to the modified transcript on the basis that it constituted improper lay opinion testimony, the defendant is foreclosed from doing so on appeal.

The record reveals the following additional relevant facts and procedural history. The audio recording of the bath time conversation, which is in Spanish, was transcribed and translated for the state by Pastor, who, at the time of trial, worked as an independent contractor performing interpretation and translation services for the state and private agencies. Pastor had worked full-time for twenty years as a translator and interpreter of Spanish and English. She was raised in a bilingual household and learned to read Spanish and English at the same time. Pastor's other relevant experience included working for one year as an interpreter and translator at the Official School of Languages in Madrid, Spain, performing English translations for a member of the Senate of the Dominican Republic, and teaching English privately and at a school in the Dominican Republic. Pastor testified regarding the methodology she used to create the translated transcription, explaining that she divided the process into two steps. She first transcribed the audio recording in the original Spanish. Only after completing the Spanish transcript did she translate it into English. She certified that the translated transcription was "true and accurate to the best of [her] ability of the original audio recording in Spanish."

In the transcription, when Pastor was unable to understand what was being said in the audio recording, she wrote "inaudible." Pastor testified that she marked twenty-four segments of the audio recording as "inaudible." She also indicated in the transcription that N had stated that the defendant touched N's "cola," which she translated as "tail."

State *v.* Ortega

On the second day of trial, outside the presence of the jury, the state proffered a modified transcription of the audio recording, created by Joselin. The state informed the court and defense counsel that, in the modified transcript, Joselin had filled in sections marked "inaudible" with what Joselin believed was said, where possible, and changed the word "cola" to "pola." Defense counsel objected to the introduction of the modified transcript on two grounds, namely, that the defense had no advance notice of the modified transcript and that Joselin was not a disinterested witness. Because of Joselin's bias, defense counsel argued, the modified transcript was unreliable. Defense counsel stated that, if the court ruled that the modified transcript was admissible, he "would need an opportunity to review [it] and [to] do [his] own investigation . . . ." Specifically, defense counsel said he would "need a continuance to have Spanish translators come in to ensure the reliability" of the modified transcript and an opportunity to review the changes to the sections marked "inaudible."

The court admitted the modified transcript on the ground that Joselin, who had been present at the time of the recorded conversation, was in a better position than Pastor to identify her own voice and statements in the audio recording. The court made no finding regarding Joselin's ability or qualifications to translate from Spanish to English, other than recognizing that Joselin was "not an interpreter and [was] not [t]here to say that this is an authentic interpretation." With respect to Joselin's ability to identify what N was saying in the audio recording, the court found that she was "not in any better position to necessarily give an interpretation [of N's statements in the audio recording] if she doesn't have an independent recollection of what the child is saying. So . . . if she has an independent recollection and remembers that [N] said one thing or

another, then that's her own factual account.'' Both
Pastor's original transcript and the modified transcript,
the court ruled, would be provided to the jury. The
question of which transcription more accurately repre-
sented what was said in the recording, the court ruled,
was a factual issue for the jury to decide.

Immediately upon the introduction into evidence of
the modified transcript, the court gave the following
instruction to the jury: ''You are the finders of fact, so
it's for you to decide . . . what is being said. So, the
reason that the [transcript becomes] significant is
because it is in Spanish, and you may not speak Spanish,
and so it's really meant to assist you. So, this evidence,
the transcript, is not coming in for substantive purposes,
it's coming in to aid you in terms of your evaluation of
what is being said. But it's for you to decide what's
being said. And I'm going to give you an example. You've
heard the witness talk about the word 'cola' versus
'pola' versus any other word. It's for you to decide what
is being said when you actually listen to it with your
own ears. So, this [is] not meant to be a directive as to
what is said. It is really meant to aid you while you're
listening to the evidence itself.''

''[T]he standard for the preservation of a claim alleg-
ing an improper evidentiary ruling at trial is well settled.
This court is not bound to consider claims of law not
made at the trial. . . . In order to preserve an eviden-
tiary ruling for review, trial counsel must object prop-
erly. . . . In objecting to evidence, counsel must
properly articulate the basis of the objection so as to
apprise the trial court of the precise nature of the objec-
tion and its real purpose, in order to form an adequate
basis for a reviewable ruling. . . . *Once counsel states
the authority and ground of* [*the*] *objection, any appeal
will be limited to the ground asserted.* . . . We have
explained that these requirements are not simply for-
malities. [A] party cannot present a case to the trial

State *v.* Ortega

court on one theory and then seek appellate relief on
a different one . . . . For this court to . . . consider
[a] claim on the basis of a specific legal ground not
raised during trial would amount to trial by ambuscade,
unfair both to the [court] and to the opposing party.
. . . Thus, because the essence of preservation is fair
notice to the trial court, the determination of whether
a claim has been properly preserved will depend on a
careful review of the record to ascertain whether the
claim on appeal was articulated below with sufficient
clarity to place the trial court on reasonable notice of
that very same claim.'' (Citations omitted; emphasis
in original; internal quotation marks omitted.) *State* v.
*Miranda*, 327 Conn. 451, 464–65, 174 A.3d 770 (2018).

Our review of the record reveals that the defense did
not raise the issue of Joselin's status as a lay witness
or object on the basis that the state had failed to proffer
Joselin as an expert in the area of creating translated
transcriptions. The two objections that defense counsel
raised—that Joselin was biased and that the state had
not provided sufficient notice of its intent to proffer the
modified transcript—were insufficient to alert either
opposing counsel or the trial court that the defense
intended to rely on Joselin's status as a lay witness
pursuant to § 7-1 of the Connecticut Code of Evidence
as a basis for objecting to the admission of the modified
transcript. Nor do the trial court's ruling and its instruc-
tion to the jurors suggest that the court understood the
defense to have raised the issue of the limits placed on
the proper subjects of lay opinion testimony. See Conn.
Code Evid. § 7-1. Although the court's ruling recognized
that Joselin was not an interpreter, that statement alone
is not sufficient to support the conclusion that the court
was on notice that the defense had relied on Joselin's
status as a lay witness to object to the modified tran-
script. The court's instruction to the jury suggests that
it viewed defense counsel's concerns to be addressed

by instructing the jury that the alternative transcripts were merely aids to assist the jury in reviewing the audio recording. Accordingly, we conclude that the defendant's claim that the modified transcript constituted improper lay opinion testimony is unpreserved.[26]

## III

Finally, we address the defendant's claim that the trial court abused its discretion in denying defense counsel's request for a continuance. The defendant claims that the court's ruling deprived him of his right to a fair trial and his right to present a defense. In response, the state contends that the record reflects that the court did not deny defense counsel's request but, instead, indicated to counsel that he could in fact request one for the purpose of consulting with an interpreter regarding the modified transcript. Because we agree with the state that the record reveals that the trial court did not in fact deny defense counsel's request, we reject the defendant's claim.

---

[26] Perhaps attributable to the defendant's failure to preserve this specific claim for review, we observe that, in its proffer of the modified transcript, the state made no showing regarding Joselin's qualifications as a translator or the methodology she employed in creating the modified transcript. We also observe that the trial court made no finding that Joselin had sufficient qualifications to create an accurate English translation of a Spanish transcription. Finally, it is unclear from the record whether Joselin "fill[ed] in" some of the portions marked "inaudible" in Pastor's transcription on the basis of Joselin's own transcription of the audio recording or, instead, on the basis of her independent recollection of the bath time conversation. We note that it remains a matter of first impression for this court whether a translated transcript is the proper subject of lay opinion testimony governed by § 7-1 of the Connecticut Code of Evidence, or whether the art of creating a transcription of a recording, and then translating that transcription into another language requires "specialized knowledge" such that the opinion must be given by an expert. Conn. Code Evid. § 7-2. Resolution of that question—and the myriad of legal issues raised by the introduction of translated transcripts into evidence; see generally C. Fishman, "Recordings, Transcripts, and Translations as Evidence," 81 Wash. L. Rev. 473 (2006)—will be aided by a more complete record on these points in future cases.

State *v.* Ortega

The record reveals the following additional relevant facts and procedural history. When the state notified the trial court and the defendant that it sought to offer the modified transcript, defense counsel objected on the ground that he lacked notice of the modification and stated that he would "need a continuance to have Spanish translators come in to ensure the reliability" of the modified transcript. In its ruling admitting the modified transcript, the court first noted that defense counsel had "had ample opportunity" during both the first trial and the present one to obtain the defendant's own translator to prepare an alternative transcription. The court continued, however, and stated: "With regard to the very minor modifications that have been made by [Joselin], and we can see what they are because they're in parentheses, *to the extent that counsel is asking for some time to be able to show those to an interpreter or to show the whole document to an interpreter, you certainly have the ability to ask for that time.*" (Emphasis added.) Accordingly, the court made it clear that, although it would not grant a continuance for the purpose of allowing the defense to produce an alternative transcript, it would consider granting a continuance for the purpose of allowing defense counsel time to consult with an interpreter regarding the modified transcript—giving the defendant precisely what defense counsel had suggested earlier, namely, a continuance for the purpose of having an interpreter review the modified transcript to ensure that it was reliable.

Put differently, a more reasonable reading of the record is that the court, after clarifying the scope of the continuance it was willing to grant, invited defense counsel to state how long he would need for the continuance. At that point, counsel could have assented to the court's offer of a continuance for the purpose of consulting an interpreter and specified the amount of

State *v.* Ortega

time he sought. Instead, counsel elected to proceed. In the absence of any indication from counsel as to the length of time he sought for the continuance, the trial court lacked a proper factual predicate for exercising its discretion to grant the continuance. See, e.g., *State* v. *Hamilton*, 228 Conn. 234, 240, 636 A.2d 760 (1994) (identifying likely length of delay as one factor courts appropriately may consider in exercising discretion to grant continuance). Accordingly, we conclude that the record does not support the defendant's claim that the trial court improperly denied defense counsel's request for a continuance.

The judgment is affirmed.

In this opinion the other justices concurred.